The Honorable Kymberly K. Evanson

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:25-cv-06078-KKE |
| Plaintiff, | UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES/OPPOSITIONS TO UNITED STATES' MOTION TO COMPEL BY DEFENDANT (Dkt. 53) AND INTERVENOR-DEFENDANTS (Dkts. 62,63) |
| v. | |
| STEVE HOBBS, in his Official Capacity as Secretary of State of the State of Washington, | |
| Defendant. | NOTED ON MOTION CALENDAR: [June 22, 2026] |

The United States seeks to compel the disclosure of federal election records and filed a Complaint (Dkt. No. 1) and Motion to Compel (Dkt. 29) directed at Defendant Secretary of State Steve Hobbs ("Secretary Hobbs") to do so. The United States respectfully submits this Consolidated Response in Opposition to: (1) Secretary Hobb's Motion to Dismiss and Opposition to United States' Motion to Compel (Dkt. 53); (2) Intervenor-Defendants Common Cause and Washington Conservation Action Education Fund's ("CC-WCAEF Intervenors") Motion to Dismiss and Response in Opposition to Motion to Compel (Dkt. 62); and (3) Intervenor-Defendants Common Power and Washington State Alliance for Power and Washington State Alliance for Retired

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

Americans' ("CP-Alliance Intervenors") Combined Motion to Dismiss and Opposition to United States' Motion to Compel (Dkt. No. 63). Collectively, Secretary Hobbs, CC-WCAEF Intervenors, and CP-Alliance Intervenors are referred to as "Movants." As detailed below, the motions to dismiss should be denied, and the Motion to Compel should be granted.

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

LEGAL STANDARD .................................................................................................... 2

ARGUMENT ................................................................................................................. 3

    I.   Title III of the Civil Rights Act of 1960 Calls for a Summary Proceeding to Compel Federal Election Records. ............................................................................................ 3

        A.  Title III was originally understood to entail summary proceedings. ............................ 4

        B.  Title III overcomes the presumption that the Federal Rules apply. ............................. 6

        C.  The Attorney General did not accede to the application of the federal rules by filing a complaint and a motion to compel. ................................................................................. 7

    II.  The Attorney General Has Provided a Basis and Purpose to Demand Records Under Title III. ............................................................................................................................... 10

        A.  The Attorney General provided a basis for the demand under the CRA. ................... 10

        B.  Voter List Maintenance is a proper purpose for the demand under the CRA. ............ 12

    III.  Washington's Statewide Voter Registration List is Covered by Title III. ......................... 16

        A.  "Comes into his possession" does not inherently exclude records and papers created by an "officer of election." ....................................................................................... 18

        B.  The legislative history and original understanding of Title III resolves any doubt that "comes into his possession" covers government-created records and papers. ........... 22

        C.  Title III's preservation and retention requirements do not conflict with the NVRA and HAVA's list-maintenance provisions. ................................................................... 25

    IV.  Federal and State Law Do Not Prevent the United States from Receiving and Using the Requested Information to Investigate Possible Violations of Federal Election Law. ........ 26

        A.  The Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act do not prevent the disclosure of Washington's SVRL. ................................................... 26

        B.  Any state law raised by movants that prevents the disclosure of Washington's SVRL is preempted. ............................................................................................................. 31

CONCLUSION ............................................................................................................. 35

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

i

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

**INTRODUCTION**

Title III of the Civil Rights Act of 1960 ("CRA") empowers the United States to obtain federal election records upon written demand. *See* 52 U.S.C. §§ 20701, 20703. When a State refuses to comply with the demand, Title III provides that the United States may seek "appropriate process to compel the production" of those federal election records. 52 U.S.C. § 20705. The United States made a written demand to Secretary Hobbs for Washington's statewide voter registration list ("SVRL"). Secretary Hobbs refused to comply with that demand necessitating this proceeding.

Title III's "chief purpose . . . is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.* (*Citizens Councils*), 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is . . . purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *affirmed sub nom; Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy* (*Coleman II*), 313 F.2d 867, 868 (5th Cir. 1963) (per curiam). Title III authorizes the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962). In other words, the United States is entitled to inspect and copy records covered by Title III even when it lacks the evidence otherwise needed to establish probable cause or to prove that a violation of federal election law had occurred.

Therefore, when the Attorney General brings an action to enforce his broad investigatory powers under the CRA, this Court's inquiry is a limited: (1) whether the Attorney General made a written demand for federal election records stating the basis and purpose; (2) whether that demand

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

was made to an "officer of election" responsible for performing any act requisite to voting in federal elections; (3) whether that officer failed or refused to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) whether the Attorney General made "a simple statement" to the Court that he satisfied these elements. *Lynd*, 306 F.2d at 225–26; 52 U.S.C. § 20703.

## BACKGROUND

On September 8, 2025, the United States Attorney General sent Washington's chief election official, Secretary Hobbs, a request for all information related to the state's procedures for ascertaining compliance with the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 20502–11, and the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. §§ 21081–85. Dkt. 30, ¶ 7-12; *see also* Dkt. 30-1, Ex. 1 to First Declaration of Eric Neff ("First Neff Decl."). As part of his request, the Attorney General sought Washington's SVRL, including HAVA-required "all fields" information. *Id*. On September 23, 2025, Secretary Hobbs sent a letter to the Attorney General refusing to provide the SVRL, claiming that state law prohibits its release. (Dkt. No. 30 ¶ 12 & Ex. 2 to First Neff Decl.) This proceeding followed.

## LEGAL STANDARD

"The United States district court for the district in which a demand is made pursuant to section 303, or in which a record or paper so demanded is located, shall have jurisdiction by *appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

**ARGUMENT**

Taken together, Sections 301, 303, and 305 of the CRA provide the "what, how, and where" the Attorney General can obtain federal election records. Section 301 enumerates what materials the Attorney General may demand. Section 303 explains how the Attorney General makes the demand. Section 305 lays out where the Attorney General's demand is enforced.

Movants contest all three pillars of the CRA. They argue that Section 305 requires the complete application of the Federal Rules of Civil Procedure ("Federal Rules"). They claim that Section 303 requires the exposure of factual allegations. They argue that Section 301 does not include records and papers created by election officers. And they argue that a multitude of privacy laws—federal and state—prevent the Attorney General from accessing Washington's SVRL.

Movants' arguments are unavailing. They rely on that general presumption that the Federal Rules apply to all civil actions, contrary to Congress's purpose in enacting the CRA. They rely on recent decisions that add additional hurdles for a proper demand and hold that Title III does not cover government-created records and papers, even though those decisions make a hash of statutory construction and subvert Congress's choices. And they rely on privacy laws to shield the disclosure of information contained in the requested records, even though such laws do not erect such a barrier or are preempted. This Court should deny their motions to dismiss and grant the Motion to Compel.

**I. Title III of the Civil Rights Act of 1960 Calls for a Summary Proceeding to Compel Federal Election Records.**

As a threshold matter, Movants argue that the Federal Rules completely govern this Case. Dkt. 53 at 8–11; Dkt. 62 at 9–10; Dkt. 63 at 8-11. In doing so, they repeat what the Fifth Circuit has described as "a basic misconception . . . concerning a Title III proceeding." *Lynd*, 306 F.2d at

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

3

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

225. Against the background in which the CRA was enacted, Title III requires a federal district court to conduct a Section 305 proceeding outside the normal scope of the Federal Rules.

**A. Title III was originally understood to entail summary proceedings.**

Two years after the CRA was enacted, the Fifth Circuit emphasized that a Title III proceeding to obtain records "is not . . . the ordinary civil action." *Lynd*, 306 F.2d at 225. Instead, it is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id*. *Lynd* recognized that treating a Title III demand to "usual notions under the Federal Rules" would frustrate the use of Title III. *Id*. at 226. Thus, it deemed Section 305 to entail "a summary proceeding." *Id*. *Lynd*'s conclusion that Section 305 entails a summary proceeding was not plucked out of thin air; instead, it was necessitated by the legislative background of the CRA.

The CRA was a corrective piece of legislation that empowered the Attorney General to investigate and enforce federal election-related laws. On February 5, 1959, President Eisenhower first proposed the legislation that eventually became Title III. The President said:

> I recommend legislation to give the Attorney General power to inspect Federal election records, and to require that such records be preserved for a reasonable period of time so as to permit such inspection. [¶] The right to vote, the keystone of democratic self-government, must be available to all qualified citizens without discrimination. Until the enactment of the Civil Rights Act of 1957, the Government could protect this right only through criminal prosecutions instituted after the right had been infringed. The 1957 act attempted to remedy this deficiency by authorizing the Attorney General to institute civil proceedings to prevent such infringements before they occurred. [¶] A serious obstacle has developed which minimizes the effectiveness of this legislation. Access to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination. But during preliminary investigations of complaints the Department of Justice, unlike the Civil Rights Commission, has no authority to require the production of election records in a civil proceeding. State or local authorities, in some instances, have refused to permit the inspection of their election records in the course of investigations. Supplemental legislation, therefore, is needed.

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

4

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

Special Message to the Congress on Civil Rights, Dwight D. Eisenhower, *Pub. Papers of the Presidents* 165–66 (Feb. 5, 1959). President Eisenhower's observation that the Department had "no authority to require the production of election records in a civil proceeding" makes no sense considering Rule 34. But President Eisenhower observed correctly: the authority that Title III granted to the Attorney General was the authority akin to what the Civil Rights Commission possessed under the Civil Rights Act of 1957 ("1957 Act"). That authority was the ability to require the production of election records outside the context of a civil action and outside the application of the Federal Rules. *See Hannah v. Larche*, 363 U.S. 420, 443–44 (1960) (approving the use of investigative hearings by the Civil Rights Commission that are not "trial-like proceedings").

Importantly, the concerns that President Eisenhower expressed in his proposal for new legislation were echoed in House Report 956, in which the House Committee on the Judiciary reported favorably on the bill that gave rise to Title III. H.R. Rep. No. 86-956 (1959). That Report stated:

> So long as there is lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit, the authority of the Attorney General is rendered relatively ineffective. The situation requires evidence which is practically impossible to assemble unless access is had to detailed information concerning application, registration, tests, and other acts and procedures requisite to voting.

*Id.* at 7. This Report makes clear that access to state and local election records is critical to enforcement of the law and that Congress intended the Attorney General to have such access. *Lynd*'s proclamation that Title III is not subject to the "usual notions under the Federal Rules," 306 F.2d at 226, was a mere recognition of the basic structure of Title III: the facilitation of the production of election records for investigatory purposes outside the scope of a civil action, and therefore outside the scope of the Federal Rules.

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

5

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

**B. Title III overcomes the presumption that the Federal Rules apply.**

Movants' reliance on *United States v. Powell* that the Federal Rules apply because "no provision specif[ies] the procedure to be followed," 379 U.S. 48, 58 n.18 (1964), which was relied on by *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402, at *8 (D. Or. Feb. 5, 2026), argued, No. 26-1231 (May 19, 2026), and *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026), argued, No. 26-1232 (May 19, 2026), is mistaken.

Movants conflate the general presumption that the Federal Rules apply, which the United States does not dispute, with the *actual holding* of *Powell*, which is that the statutory structure of the Internal Revenue Code ("IRC") required the application of the Federal Rules, *see* 379 U.S. at 58 n.18 (citing *Martin v. Chandis Securities Co.*, which merely held that the IRC—not all federal statutes—fell into the scope of the Federal Rules, 128 F.2d 731, 734 (9th Cir. 1942)). Yes, that statute included the phrase "appropriate process." *See Powell*, 379 U.S. at 58 n.18 (mentioning 26 U.S.C. § 7604(a)). But no, *Powell* does not hold that such a terse phrase *ipso facto* entails the full application of the Federal Rules.

*Powell* only reiterated the general presumption that the Federal Rules govern all suits of a civil nature, *see N.H. Fire Ins. Co. v. Scanlon* (*N.H. Fire*), 362 U.S. 404, 405–06 (1960), and this Court should not read *Powell* to have changed that rule in a footnote, *see Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."). Movants' arguments would expand "appropriate process," 52 U.S.C. § 20705, to "the same process used in every other civil action and proceeding in the United States," *cf.* Fed. R. Civ. P. 1, creating surplusage that is at odds with the legislative background in which the CRA was enacted.

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

6

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

This Court of Appeals for this Circuit—the very court that decided *Martin*—shares this understanding. In *SEC v. McCarthy*, the court considered whether the Federal Rules govern proceedings under 15 U.S.C. § 78u(e). 322 F.3d 650, 656 (9th Cir. 2003). That provision permitted the Securities and Exchange Commission ("SEC") to seek enforcement of its orders "[u]pon application of the Commission." 15 U.S.C. § 78u(e). "Upon application" is no more definitive than "appropriate process" in detailing the process to be used; yet, the *McCarthy* court concluded that the *N.H. Fire* presumption was overcome because the congressional purpose in enacting the provision, apparent from the legislative history, would be defeated if the Federal Rules applied, 322 F.3d at 658–59; *see also United States v. Vivian*, 224 F.2d 53, 57 (7th Cir. 1955) (rejecting defendant's reliance on *Martin* that the Federal Rules apply to 8 U.S.C. § 1255(d)(4)(B) because applying the Federal Rules "would frustrate the theory and purpose of [Section 235(a) of the Immigration and Nationality Act of 1952] if every rejected subpoena would have to be subjected to a separate civil proceeding accompanied by issuance of process bottomed on a complaint"). Thus, based on evidence that Congress granted the SEC "broad and flexible authority," *McCarthy*, 322 at 658 (quoting S. Rep. No. 94–75, at 2 (1975)), the court held—long after *Powell* was decided—that "§ 21(e) of the Exchange Act authorizes the use of *summary proceedings*," *id.* at 658-659. Applying the Federal Rules here to Section 305 would similarly frustrate the theory and purpose of a statute Congress has enacted.

**C. The Attorney General did not accede to the application of the federal rules by filing a complaint and a motion to compel.**

Perhaps cognizant of this, CC-WCAEF Intervenors argue that the Federal Rules nevertheless apply because the United States "chose to initiate this civil action and file a motion to compel." (Dkt. 62 at 10.) "[T]his argument is one of semantics, not substance," *In re Enf't of Philippine*

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

7

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

*Forfeiture Judgment Against All Assets of Arelma, S.A.*, 153 F.4th 142, 156 (2d Cir. 2025), *petition for cert. filed*, (U.S. Dec. 22, 2025) (No. 25-744), and applying form over substance this way is untenable, *cf. Newsom v. Trump*, 141 F.4th 1032, 1043–44 (9th Cir. 2025) (per curiam) (treating a temporary restraining order as a preliminary injunction); *Borntrager v. Cent. States*, *Se. & Sw. Areas Pension Fund*, 425 F.3d 1087, 1091 (8th Cir. 2005) (rejecting an order as final merely because "the Clerk of Court entered a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure"); *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1297 (11th Cir. 2001) (deciding that a document labeled "Final Judgment" was not a final judgment because "content counts over caption"); *McKinney v. Gannett Co.*, 694 F.2d 1240, 1247 (10th Cir. 1982) (holding that a self-titled "Final Judgment" was not final); *Harris v. Goldblatt Bros.*, 659 F.2d 784, 786 (7th Cir. 1981) (concluding that the judgment was not final even though the district court "stated that it was a final judgment"); *Katzenbach v. McClung*, 379 U.S. 294, 295 (1964) ("[W]e may and do consider this complaint as an application for a declaratory judgment . . . ."); *Kennedy v. Owen*, 321 F.2d 116, 117 (5th Cir. 1963) (rejecting procedural argument that the Title III demand was faulty because the demand described the correct person with the wrong title).

Far from hiding the ball, the Complaint explicitly states that the instant action is brought under Section 305 of the CRA, which contemplates no other proceeding than one done by "appropriate process." 52 U.S.C. § 20705. And no Federal Rule was mentioned in the Motion to Compel. *Cf. Citizens Councils*, 187 F. Supp. 846, 847 (noting that Title III is not at issue if the United States files a motion to produce records "under Rule 34"). As *Powell* itself recognized, this Court should not "be holding too strictly to the forms of pleading." 379 U.S. at 52 (treating enforcement proceeding as having been brought under the correct provision); *see also Martin*, 128 F.2d at 734

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

8

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

(construing the "Petition" as a complaint). Therefore, if an "Application" is more appropriate, this Court can and should treat the Complaint and the Motion to Compel as an "Application" to compel the production of demanded records under Section 305 of the CRA.

Congress enacted Section 305 to provide an *alternative* method for the Attorney General to obtain federal election records without subjecting himself to a full trial. *See Citizens Councils*, 187 F. Supp. at 847. Instead, Movants would have this Court contravene congressional intent. If the Federal Rules apply to Section 303 demands, the Attorney General's investigations would be subject to great delay. Such an outcome is unlikely based on "the use of the simple and unambiguous words with which it described this proceeding." *Goodyear Tire & Rubber Co. v. N.L.R.B.*, 122 F.2d 450, 451 (6th Cir. 1941) (deciding the Federal Rules do not apply to a statute which simply "calls for an 'application' rather than a petition" and "for an 'order' rather than for a judgment"). The normal rules of discovery are not applicable here because, as the legislative background of the CRA reveals, "there is an undeniable need on the [Attorney General's] part for swift and efficient investigation, a need which would be frustrated if every [officer of election] investigated could convert the investigation into a trial." *Fed. Election Comm'n v. Fla. for Kennedy Comm.*, 492 F. Supp. 587, 590 (S.D. Fla. 1980), *rev'd on other grounds by* 681 F.2d 1281 (11th Cir. 1982) (declining to apply the Federal Rules to the Federal Election Campaign Act). The Federal Rules do not apply because to do so defeats the purpose of Sections 303 and 305. The process to enforce a Section 303 demand under Section 305 entails a summary proceeding.

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

9

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

## II. The Attorney General Has Provided a Basis and Purpose to Demand Records Under Title III.

As CC-WCAEF Intervenors acknowledge, the United States "must satisfy the basic administrative requirements outlined in" Section 303 to obtain records. Dkt. 62 at 10. Contrary to Movants' assertions, the United States has done so.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand for federal election records, stating "the basis and purpose therefor." 52 U.S.C. § 20703. The United States has done that: on September 8, 2025, the United States sent Secretary Hobbs a written demand for a copy of Washington's SVRL. Dkt. 30, ¶ 7–12; *see also* Dkt. 30-1, Ex. 1 to First Declaration of Eric Neff ("Neff Decl."). As stated in that letter, the basis for the demand was Title III of the CRA, the NVRA and HAVA, and the purpose was to "assess [Washington's] compliance with the statewide VRL maintenance provisions of the NVRA." Dkt. 30, ¶ 10.

### A. The Attorney General provided a basis for the demand under the CRA.

Movants contend that there is no basis for the demand because the CRA requires the Attorney General to provide a "factual" basis for the demand rather than a legal one, and that the demand contains no allegation that there is anything amiss with Washington's list maintenance. *See, e.g.*, Dkt. 53 at 26–28; Dkt. 62 at 12–13; Dkt. 63 at 17–18. This topic is briefed in detail in the Motion to Compel, *see* Dkt. 29 at 13, but the Motions to Dismiss cite new cases decided after that filing.

Movants cite *United States v. Amore*, where the district court ruled that the Attorney General's written demand for Rhode Island's statewide voter registration list was legally insufficient

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

10

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

under the CRA because it provided no "factual basis" suggesting Rhode Island may be violating the NVRA or HAVA. *See* Dkt. 53 at 16–17, citing *Amore*, 2026 WL 1040637, at *5 (D.R.I. Apr. 17, 2026). Similarly, Movants cite *United States v. Galvin*, where the District Court ruled that the CRA requires that the Attorney General's written demand for records must provide a "factual basis," not just a legal basis, to support a demand. *See* Dkt. 62 at 13, citing *Galvin*, No. 25-13816, 2026 WL 972129, at *3 (D. Mass. Apr. 9, 2026).

*Amore* and *Galvin* are incorrect. First, *Amore* repeated the errors committed by the district courts in California and Oregon by holding that the Attorney General must state a *factual* basis for the demand. *Lynd* actually held that the "factual foundation for, or the sufficiency of," the basis put forward by the Attorney General "is not open to judicial review or ascertainment." 306 F.2d at 226.

*Galvin* acknowledged that in *Lynd* the stated basis for the demand was merely that there was "information in the possession of the Attorney General tending to show that" the states were violating the law. *Galvin*, 2026 WL 972129, at *4 (citing *Lynd*, 306 F.2d at 229 n.6). Nevertheless, *Galvin* ruled that the Attorney General's written demand letters did not provide a factual basis that satisfied *Lynd*. *See id.* at *4. The United States respectfully disagrees with *Galvin*'s overly formalistic interpretation of CRA procedure, as well as its findings regarding the two demand letters. In contrast to *Galvin*, *Benson* noted that a similar pair of demand letters "collectively put [the State] on notice of the basis and purpose of its request, which is sufficient to comply with the CRA." *United States v. Benson*, 819 F. Supp. 3d 753, 767 (W.D. Mich. 2026), *argued*, No. 26-1225 (6th Cir. May 13, 2026).

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

11

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

Furthermore, *Galvin*'s formalistic approach is predictably impractical, something Congress likely would have intended to avoid in creating a pre-enforcement mechanism. If this Court were to adopt *Galvin*'s formalistic approach, the United States would request leave to send Secretary Hobbs a curing elaboration letter, thus avoiding a dismissal on the merits and the resulting unnecessary delay in resolution of the underlying legal issues. As a district court judge recognized, [i]f . . . I find the [written demand] letter does not meet the requisites for a court order, aren't we just back here in six months after a new letter has been sent?" Transcript of Oral Argument at 85:19-22, *United States v. Thomas*, No. 3:26-cv-00021-KAD (D. Conn. argued Mar. 19, 2026) (Ex. 14 to the Second Declaration of Eric Neff ("Neff 2d Decl."), submitted with this Consolidated Response).

**B.  Voter List Maintenance is a proper purpose for the demand under the CRA.**

Defendants next argue that the United States failed to provide a valid purpose for its demand. Dkt. 53 at 19-20; Dkt 62 at 1417; Dkt. 63 at 18–22. The demand's purpose is to "assess Washington's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act (NVRA)." *See* Dkt. 29 at 5–6.

Title III of the CRA imposes a "sweeping" obligation on an officer of election to preserve and produce federal elections records and make them available upon "demand" of the Attorney General. *Lynd*, 306 F.2d at 226. Movants ask the Court to limit Title III to investigations of racial discrimination in voting. *See, e.g.*, Dkt. 53 at 14, 17–18.

Secretary Hobbs argues that enforcing the NVRA and HAVA are not proper purposes. (Dkt. 53 at 19–20.) However, engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

12

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

undermining the Attorney General's enforcement of HAVA and the NVRA to protect voting rights. Congress used express language in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, Pub. L. No. 86-449, 74 Stat. 90 (codified as amended at 52 U.S.C. § 10101) (applying Title VI of the CRA to violations of rights "on account of race or color"). The express language of Title VI of the CRA is consistent with express limitations Congress has made to remedies in other civil rights statutes. *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race [or] color" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301–06, 10309 (prohibiting discrimination "on account of race [or] color" in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604–06, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limits Title III of the CRA to voting rights violations based upon racial discrimination. *See* 52 U.S.C. §§ 20701–06.

CC-WCAEF Intervenor argues that voter-list maintenance is not "actually [the Attorney General's] . . . full purpose[.]" Dkt. 63 at 21. Nothing in the text suggests that the Attorney General is limited to a single basis or purpose in making a demand. The fundamental purpose of a notice requirement is to provide recipients with effective and timely notice that enables them to understand the basis for the complaint and take corrective action. This conclusion is reinforced by settled interpretive canons.

Under the ordinary-meaning canon, the Section 303 requirement that a demand include "the basis and the purpose," 52 U.S.C. § 20703, is most naturally read as a minimum requirement, not a limitation of later stated additional purposes or a suggestion that only one purpose is the "actual purpose." *See generally United States v. Friedrich*, 402 F.3d 842, 845 (8th Cir. 2005) ("A

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

13

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as having their ordinary, contemporary, common meaning."). Movants' reading would improperly convert a floor into a ceiling.

Nor does the negative-implication canon (*expressio unius est exclusio alterius*) support Movants' position. That canon applies, if at all, only where statutory context indicates that the enumeration of items in a statute is meant to be exhaustive. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 152 (2003). Here, there is no indication to that effect in Section 303. Congress did require the Attorney General to state only one purpose, or that only one purpose is the actual purpose. Importing such a restriction would invert the negative-implication canon by manufacturing one from silence. Courts are obligated to "refrain from embellishing statutes by inserting language that Congress has opted to omit." *Jama v. INS*, 329 F.3d 630, 634 (8th Cir. 2003) (quoting *Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000)).

Moreover, in *Gallion,* the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." 187 F. Supp. at 848 (emphasis added). The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell* (*Coleman I*), 208 F. Supp. 199, 200 (S.D. Miss. 1962) (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Secretary Hobbs, citing *Weber*, *Oregon*, and *Amore* also suggests that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. (*See* Dkt. 53 at 19.) Actually, the opposite is true—

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

examining compliance with HAVA is essential to securing an individual's right to vote.  In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford and Jimmy Carter, serving as Honorary Co-Chairs, explained why adding driver's license information and the last four digits of the Social Security numbers for federal elections protected *individual voters*:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32–33 (Aug. 2001) (attached as Exhibit 12 of Second Neff Decl.). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *Id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* The Commission explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when Congress enacted HAVA in 2002. Congress explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

15

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

of voters appearing at a polling place only to discover that no record of their registration can be found."[1] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Adding a requirement that does not exist in Title III of the CRA would violate the statute's express congressional mandate as well as undermine the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. Indeed, the Department's Office of Legal Counsel recently explained persuasively that Congress clearly intended Title III to apply to future federal statutes, not just to preexisting laws:

> If anything, other aspects of Section 303's legislative history demonstrate that it does *not* limit the purposes for which it can be used to enforce preexisting voting statutes. For example, an early version of what eventually would become Section 303 would have authorized [the Department of Justice], when "conducting any investigation in carrying out the powers and authority conferred in [section 131(c) of the 1957 law] …, to require by subp[o]ena the production of such [materials] as may be relevant or material to such investigation." … As enacted and signed into law, section 303 conspicuously omits that limitation … "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded."

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. ___, slip op. at 19 (May 12, 2026) (citations omitted). Therefore, this Court should decline to hold that enforcing the NVRA or HAVA are invalid purposes.

## III. Washington's Statewide Voter Registration List is Covered by Title III.

Section 301 provides that an officer of election must retain "all records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting" in a

---

[1] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. First Neff Decl. ¶¶ 15–17. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N.C. State Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached to the First Neff Decl. at ¶16, Ex. 4). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N.C. State Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026).

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

16

federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701. Regardless of who created Washington's SVRL, no party denies that Secretary Hobbs has "custody, possession, or control of such record or paper," and therefore must make it "available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

When a statute does not define a word or phrase, as is partially the case here, ordinary meaning usually controls. Washington's SVRL is certainly a record that relates to voting registration. The ordinary meaning of the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 566 n.1 (2011) (noting that the term "related" is "expansive"). As required by Section 303 of HAVA, 52 U.S.C. § 21083, Washington's SVRL identifies who is registered to vote, and it is undisputed that such a list "has 'a connection with, or reference to,' the topics" at issue, *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384)—namely, voter "registrations," 52 U.S.C. § 20701.

Movants do not contest that Washington's SVRL is a record, nor do they argue that it does not relate to registration. Rather, they argue that Washington's SVRL is not covered by Section 301 became it is not a record that "come[s] into [Secretary Hobbs's] possession." 52 U.S.C. § 20701. This interpretation has gotten some traction in various district courts that have rejected similar demands for federal election records. *United States v. Bellows*, No. 1:25-cv-00468-LEW, 2026 WL 1430481, at *6 (D. Me. May 21, 2026); *United States v. Wis. Elections Comm'n*, No. 3:25-cv-01036-JDP, 2026 WL 1430354, at *3–4 (W.D. Wis. May 21, 2026); *United States v.*

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

17

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

*Fontes*, No. 2:26-cv-00066-PHX-SMB, 2026 WL 1177244, at *2–4 (D. Ariz. Apr. 28, 2026); *Benson*, 819 F. Supp. 3d at 768. The decisions of these courts have differed in their details, but the core of each court's reasoning has been that an SVRL is created by election officials, not received from a voter-registration applicant, and therefore the SVRL does not "come into [the] possession" of an election official, 52 U.S.C. § 20701. *Bellows*, 2026 WL 1430481, at *6; *Wis. Elections Comm'n*, 2026 WL 1430354, at *3–4; *Fontes*, 2026 WL 1177244, at *2–4; *Benson*, 819 F. Supp. 3d at 768. But this interpretation is mistaken.

**A. "Comes into his possession" does not inherently exclude records and papers created by an "officer of election."**

There is nothing inherent in the phrase "comes into his possession" that excludes records and papers created by an "officer of election." To the contrary, one can both create something and therefore be in possession of it. For example, it would be nonsensical to interpret the phrase "an individual's intent comes into existence" to suggest that some outside entity put the intent into the individual's mind. *Cf. United States v. Adcock*, 49 F. Supp. 351, 353 (W.D. Ky. 1943) ("[A] taking can exist whenever the intent to do so comes into existence . . . ."). Indeed, both treatises and court opinions have used the phrase "comes into his possession" or a similar variation to encompass records created by the possessor. An attorney who creates a document for a client has come into possession of that document. 35A C.J.S. Federal Civil Procedure § 695 & n.13 (describing *Bifferato v. States Marine Corp. of Delaware*, 11 F.R.D. 44, 46 (S.D. NY 1951), a case where witness statements *were taken by the defendant's attorney*, as a situation where "[the] attorney for a party *comes into possession of a document as attorney* for that party" (emphasis added)). An individual who opens a bank account has come into possession of that bank account. 90 C.J.S. Trover and Conversion § 37 & n.12 (describing *Smith v. Cahill*, 182 So. 3d 557, 559 (Ala. Civ.

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

18

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

App. 2014), a divorce case involving an equity account created in the husband's name, as involving a situation where the "husband rightfully came into possession of an equity account during the marriage"). A disclosure request for documents which come into the possession of the Internal Revenue Service ("IRS") covers documents created by the IRS. *United States v. Ajudua*, No. 1:12-cr-1702-JB, 2013 WL 2284960, at *8 (D.N.M. May 22, 2013) (referring to the United States' request for disclosure of tax documents—including files that are created by the IRS—as a request for disclosure of documents "which *come*[] *into possession of the IRS* subsequent to the date of this order" (emphasis added)). Similarly, a district court concluded that "[26 U.S.C. § 6103] is not triggered until after the United States *comes into possession of* tax returns or *return information*," *United States v. Art Metal-U.S.A., Inc.*, 484 F. Supp. 884, 887 (D.N.J. 1980) (emphases added), even though "return information" includes "data . . . recorded by, prepared by . . . the Secretary," 26 U.S.C. § 6103.

This varied use of "comes into [the creator's] possession" even appears in a Supreme Court opinion. Justice Marshall, writing for the Court in a case interpreting the Freedom of Information Act, explained "control [to] mean that the materials have *come into the agency's possession* in the legitimate conduct of its official duties," *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 135, 145 (1989) (emphasis added), and defined such materials to encompass "documentary materials . . . *made* or received by an agency," *id.* (quoting 44 U.S.C. § 3301). *Accord United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 602 (D.C. Cir. 2004) (concluding that a document created by the IRS to respond to Congress and kept as a separate file is a document which "[has] come into the agency's possession in the legitimate conduct of its official duties" (quoting *Tax Analysts*, 492 U.S. at 145)); *Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 74 (D.D.C. 2006) (concluding

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

19

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

that visitor logs created by the Secret Service are records which "have 'come into the agency's possession in the legitimate conduct of its official duties'" (quoting *Tax Analysts*, 492 U.S. at 145)). Thus, *Benson*, *Fontes*, *Bellows*, and *Wisconsin Elections Commission* were wrong to conclude that "comes into his possession" must exclude records and papers that are created by the officer of election or other government official. *Cf. Acquisition*, *Black's Law Dictionary* 41 (4th ed. 1951) ("*Original acquisition* is that by which a man secures a property in a thing which is not at the time he acquires it . . . ." (emphasis in original)).

One of the dictionary definitions these district courts have used to conclude otherwise merits a special discussion because it involves a peculiarity that highlights the shortcoming in relying on cursory citations to dictionaries: the definition of *Receive* from the 2024 edition of *Black's Law Dictionary*. *Benson*, 819 F. Supp. 3d at 768; *accord Bellows*, 2026 WL 1430481, at *6. This particular evidence suffers in two emblematic ways.

First, the meaning of a statute's text is fixed from *when the statute was enacted*. Therefore, the meaning "comes into possession" had in 2024 does not tell the Court what "comes into possession" meant in 1960. And as the cases of *Tax Analysts*, *Art Metal-U.S.A.*, and *Ajudua* suggest, the ordinary meaning might have changed materially or not control at all.

Second, even if the definition of *Receive* in the 2024 edition of Black's Law Dictionary was *exactly the same* as the 1960 version, *cf. Receive*, *Black's Law Dictionary* 1433 (4th ed. 1951) ("To take into possession and control; accept custody of."), the text of the 2024 definition itself would not resolve the disagreement. That is because it is susceptible to two meanings. The *Bellows* court read "to come into possession of or get from outside source" and concluded that "to come into possession of" is synonymous with "get from outside source." But there is another way to

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

20

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

read that language: "receive" means "to come into possession of . . . outside source," which has the same meaning as "to . . . get from outside source." Depending on whether the series-qualifier canon or the rule of the last antecedent applied, "to come into possession" has two different meanings.[2] *Compare Facebook, Inc. v. Duguid*, 592 U.S. 395, 403 (2021) (applying series-qualifier canon), *with Lockhart v. United States*, 577 U.S. 347, 351–52 (2016) (applying the rule of the last antecedent).

This Court need not split those canons because as late as 1959, "[r]eceive" meant "[t]o *come into possession* of, get, acquire, or the like, *from any source outside of oneself*." *Webster's New International Dictionary* 2076 (2d ed. 1959) (emphases added). Under this definition, there is no ambiguity problem. By whichever method this Court reads the definition, "from any source outside of oneself" modifies "come into possession of"—a modification that is utterly unnecessary if "come into possession of" inherently excludes self-created sources. Courts should not mechanically import a dictionary definition, particularly if that definition is susceptible to ambiguity.

The phrase "comes into his possession" does not inherently exclude internal sources. For example, the phrase "within ten years after this Act comes into effect" does not suggest that "comes into" narrowed the meaning of "effect." Indeed, Congress could have written a statute with the phrase "comes into acquisition," and a court could only interpret that phrase to be coextensive with "acquire," even though it would seem to conflict with the rule against surplusage. When "comes into possession" could be read to mean comes from an external source—supposedly an application against the rule against surplusage—*or* read to mean comes from external or internal source—in

---

[2] The ambiguity is more apparent in the following hypothetical definition of citizen: a male or female above the age of eighteen. Under the *Bellow* court's reading, "above the age of eighteen" only modifies "female." But one can also think that the modifier applies to both "male" and "female"—in the same way "outside source" modifies both "come into possession of" and "get from."

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

21

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

which case the phrase can be thought as ambiguous, "applying the rule against surplusage is, absent other indications, inappropriate." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). Indeed, interpreting "comes into possession" to include records and papers that are generated by the officer of election the Section 303 demand was directed at "respects the words of Congress," *id*. at 536, no matter verbose or succinct it chooses to be. Thus, it is even "appropriate to tolerate a degree of surplusage." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 137 (2007). This approach also "avoid[s] the pitfalls that plague too quick a turn to the more controversial realm of legislative history." *Lamie*, 540 U.S. at 536.

### B. The legislative history and original understanding of Title III resolves any doubt that "comes into his possession" covers government-created records and papers.

Moreover, the legislative history of the CRA supports the United States' position. When creating the CRA, Congress did not distinguish between records and papers submitted by voters or records and papers created by an officer of election or any other government employee.[3] As discussed earlier, Congress enacted the CRA to correct deficiencies with the 1957 Act and the inadequacy of the Civil Rights Commission. The United States would have been unable to ascertain racial discrimination related to voting without examining records revealing which applicants were rejected—records that *could not be provided from an outside source*. *See, e.g.*, The Report of the United States Commission on Civil Rights 89 (1959) ("The 5-year-old *official voting list of Bullock County* showed only five registered Negroes in the county." (emphasis added)).

---

[3] The structure of Title III's retention and preservation requirements accords with the United States' reading and militates against any concern about surplusage. Section 301's inclusion of self-generated records makes sense because Section 303 can only be directed at those who retain records. But as later cases such as *Tax Analysts* elaborate, "comes into his possession" is not just about "possession"—it is about possession in the performance of the officer of election's official duties. *See Tax Analysts*, 492 U.S. at 145; *cf. Lynd*, 306 F.2d at 230.

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

22

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

Secretary Hobbs argues that the United States' interpretation would render "come into his possession" a nullity. Dkt. 53 at 11–13. Not so. Eliminating that phrase would create a duty not just to retain and preserve, but also to affirmatively source records and papers. Section 301 does not impose record generation or sourcing duties; it imposes *retention and preservation* duties. (*See* Dkt. No. 29 at 18-19.) The first courts implementing Title III's scheme also understood that Section 301 could cover records and papers created by states or localities. In the district court order that was upheld in *Lynd*, the district court compelled local election officials to produce not only election records they received from applicants (i.e., records they had "compiled") but also election records they created themselves (i.e., records they had "prepared"). *See* Second Neff Decl., Ex. 13; *Webster's New Int'l Dictionary* 545 (2d ed. 1959) (defining "compile" as "[t]o put together; to heap up; to construct; build"); *id.* at 1952 (defining "prepare" as "to make ready; to put into a state for use or application"); *see also id.* at 2098 ("***Registration lists*** are either *prepared* or revised during a certain definite period before a primary or election . . . ." (second emphasis added)). Significantly, the Fifth Circuit in *Lynd* quoted, with approval, the "prepared or compiled" language from these district court orders, *Lynd*, 306 F.2d at 229, and it affirmed the orders, saying that they "were proper," *id.* at 231. *See* Second Neff Decl., Ex. 13. And in response to the *Lynd* decision, local election officials produced election records they created (voter-registration lists) as well as those they received (applications for registration). Until this year, that understanding withstood the test of time. *See In re Supervisors of Election*, 1 F. 1, 5–6 (C.C.D. Del. 1880) (recognizing that "registration" under Section 2011 of the Revised Statutes of the United States refers to "the act of making a list, or catalogue, or schedule, or register"); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (noting that Section 301 encompasses poll lists, ballot envelopes, tally sheets, and

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

23

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

computer programs used to tabulate votes); *see also* Craig C. Donsanto & Nancy L. Simmons, Federal Prosecution of Election Offenses 84–85 (7th ed. 2007) ("[Section 301] does not require that states or localities produce records in the course of their election processes. However, if a state or locality chooses to create a record that pertains to voting, this statute requires that record be retained if it relates to voting in an election covered by the statute.").

In light of *Benson*, *Fontes*, *Bellows*, and *Wisconsin Elections Commission*, it is critically important for this Court to appreciate that if this cramped meaning of "comes into his possession" was the law during the 1960s, the Attorney General could not have investigated the discriminatory voter-registration practices that, at the time, prevented black citizens from registering in several local jurisdictions in Alabama, Mississippi, Louisiana, and other states. Immediately after the CRA was enacted, Attorneys General William P. Rogers and Robert F. Kennedy used Title III to investigate voting practices primarily in southern states. In a series of cases, the United States sought records related to voter registrations. Only because local officials were compelled in the 1960s to produce records created by state actors (as well as the applicants themselves) was the Attorney General able to confirm which applications had been accepted and which applications had been rejected. Simply put, if Title III did not apply to the documents that those four district courts have said do not apply, jurisdictions during the 1960s could have continued to avoid accountability for excluding black citizens who sought to register. This result would have clearly contradicted Congress's reason for enacting Title III.

Acutely, Movants' arguments would have nullified Title III coverage over the payment of poll taxes. When Title III was enacted, the poll tax system *was* the voter registration system for several jurisdictions. *See, e.g.*, *United States v. Texas*, 252 F. Supp. 234, 240 (W.D. Tex. 1966),

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

24

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

*aff'd sub nom. Texas v. United States*, 384 U.S. 155 (1966) (per curiam) ("Texas does not have a separate system for registration of voters."). Concluding that a SVRL is not a covered record under Section 301 is akin to exempting the entirety of the poll tax administration from Title III during the 1960s, no matter how much it "relat[es] to . . . payment of poll tax, or other act requisite to voting," 52 U.S.C. § 20701. *See United States v. Alabama*, 252 F. Supp. 95, 97 (M.D. Ala. 1966) ("[T]he collector is required to furnish the Judge of Probate in his county with a list, by name, sex and race, of those persons who have paid the poll tax. The Probate Judge compiles the list of qualified voters by comparing the list of registered electors with the poll tax lists furnished to him by the tax collectors, and furnishes the list of qualified electors to the appropriate election offi-cials." (footnotes omitted)). That cannot be the law.

And it need not be the law. The legal meaning of "comes into his possession" can naturally include records and papers created by the possessor. Based on the text, as well as the legislative history, how courts have interpreted similar phrases, and how earlier courts have interpreted Sec-tion 301, Section 301 covers records and papers created by an election officer. Its preservation and retention requirements apply to any covered record that an election officer comes across in the course of his official duties. Therefore, Washington's SVRL is subject to a Section 303 demand.

### C. Title III's preservation and retention requirements do not conflict with the NVRA and HAVA's list-maintenance provisions.

Movants argue Title III does not cover Washington's SVRL because the CRA, NVRA, and HAVA somehow conflict with one another—that list maintenance under the NVRA and HAVA would otherwise be criminal conduct under Section 302 of the CRA. *See, e.g.*, Dkt. 53 at 14–16; Dkt. 63 at 13–14.

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

25

This argument does not withstand scrutiny. Section 302 only considers willful, ill intent to alter SVRL records—using the verbs "steals, destroys, conceals, mutilates, or alters." *See* 52 U.S.C. § 20702. Indeed, the list of verbs in Section 302 defines the provision's scope. *Cf. Fischer v. United States*, 603 U.S. 480, 487 (2024) (interpreting "otherwise" through neighboring words). Section 302's enumerated verbs all describe actions typically taken to make a document unavailable, inaccessible, or inaccurate for evidentiary purposes. *Id.* at 489–90 (analyzing similar list of verbs). Those verbs do not implicate SVRL maintenance, which is designed to ensure accuracy and confidence in voter registration rolls, not to undermine them. Thus, actions such as adding a new eligible voter to the SVRL is not "alter[ing]" the SVRL at all. 52 U.S.C. § 20702. Instead, that act creates a record that is subject to Section 301. Furthermore, the use of "willfully" in criminal statutes generally requires the defendant to act "with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 193 (1998). The normal course of list maintenance would not violate Section 302. List maintenance is a statutory duty, not unlawful conduct.

## IV. Federal and State Law Do Not Prevent the United States from Receiving and Using the Requested Information to Investigate Possible Violations of Federal Election Law.

Lastly, Movants argue that various federal and privacy laws prohibit the Attorney General's demand for, or Secretary Hobbs's disclosure of, Washington's SVRL. These arguments are either affirmative defenses, which cannot form a basis for dismissing the demand, or are arguments foreclosed by federal law.

### A. The Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act do not prevent the disclosure of Washington's SVRL.

CP-Alliance Intervenors invoke the Privacy Act; Secretary Hobbs invokes the Privacy Act as well as the E-Government Act ("EGA") and the Driver's Privacy Protection Act ("DPPA").

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

26

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

(Dkt. 53 at 20–27; Dkt 62 at 26–28; Dkt. 63 at 24–33.) They argue that these federal statutes require the dismissal of the Complaint.

The Privacy Act arguments cannot succeed because they are affirmative defenses and not a basis for dismissing the Complaint. *See generally Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[C]ourts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses."). Furthermore, these arguments assume—without explanation—that a violation of the Privacy Act forms a basis for *blocking* the Attorney General from receiving Washington's SVRL. *See, e.g.*, *Cell Assocs., Inc. v. Nat'l Insts. of Health*, 579 F.2d 1155, 1159 (9th Cir. 1978) (recognizing that certain violations of the Privacy Act can only be remedied through damages); *see also A.F.S.C.M.E., v. S.S.A.*, 771 F. Supp. 3d 717, 783 (D. Md. 2025). Of course, that matters only *if* the Attorney General has violated the Privacy Act.

The Attorney General has not violated the Privacy Act by demanding Washington's SVRL and he will not violate the Privacy Act if Secretary Hobbs is compelled to disclose it under Section 305. Secretary Hobbs and CP-Alliance Intervenors claim that the United States identifies no System of Records Notice ("SORN") that permits the collection of Washington's SVRL. (Dkt. 53 at 24; Dkt. 63 26–29.) But the Privacy Act simply requires information to be securely stored and not be subject to unauthorized dissemination or use.[4]

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department's Civil Rights Division's Privacy Policy, which is published online. The full list of routine uses for this collection of information, which

---

[4] As *Lynd* recognized under similar circumstances, any legitimate privacy concerns can be addressed through an appropriate protective order governing the production of the demanded federal election records, including compliance with Section 304 of the CRA and the Privacy Act. *See* 306 F.2d at 230.

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

27

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

include investigations and enforcement actions, can be found in the Department's SORN, most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. The list of routine uses for this collection of information includes JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). As referenced in SORN CRT-001 in the categories of records in the system: "The delegated legal duties and responsibilities of each section are described in detail at the Civil Rights Division's web page: *http://www.usdoj.gov/crt/crt-home.html*." 68 C.F.R. 47611. Similarly, it is noted that the purposes of the SORN are broad:

> The purposes of this system are to assist all the sections within the Division in maintaining names of Division employees and their case investigation assignments, names of defendants or investigation targets, victims, witnesses or potential witnesses, or other persons or organizations as they relate to potential or actual cases, investigations, and matters of concern to CRT.

*Id*. The statutes cited for routine use in the Department SORNs include enforcement of HAVA, the NVRA, and the CRA, as described in note 16 of the Department's Privacy Policy.[5] The United States made its requests and filed this case pursuant to those statutes. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Consistent with the Privacy Act, including its provision discussing the First Amendment, 5 U.S.C. § 552a(e)(7), enforcement of HAVA and the NVRA is within the scope of an authorized

---

[5] States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021) (last visited April 15, 2026).

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

28

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

law enforcement activity—necessarily implying that the United States can obtain the materials. A contrary conclusion effectively would prevent the Civil Rights Division from engaging in any investigations or enforcement actions at all. This Privacy Act argument would equally apply to a demand for records for the purpose of enforcing the 1957 Act. There is no indication Congress meant to limit Section 301's reach with the Privacy Act. That is not what Congress intended.

Instead, Movants are seeking a judicially-imposed limit on Title III, restricting the duty to produce records under Title III to publicly available records. (Dkt. 53 at 21.) The text of Title III, though, refutes this nontextual exception by explicitly requiring the *nondisclosure* of records produced to the Attorney General:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. This provision only has meaning if the records that must be produced under the CRA potentially include non-public information. Section 301 refers broadly to "all records and papers" relating to registration to vote in a federal election. 52 U.S.C. § 20701. Section 304 limits the entities to whom the Attorney General may disclose those records. *Id.* § 20704. Movants' argument is also at odds with the reason for Title III: to make what was previously non-public subject to disclosure. *See* Report of the United States Commission on Civil Rights 138 (1959) ("Therefore, the Commission recommends . . . that all State registration and voting records shall be public

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

29

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

records . . . .").[6] Title III contemplates the disclosure of non-public information and Movants' contrary argument fails as a matter of law.

Secretary Hobbs's alternative statutes fare no better. He argues that EGA requires the Department to undergo a privacy impact assessment ("PIA") before any Section 303 demand, and that the DPPA prevents the disclosure of Washington's SVRL because it is infused with personal information from motor vehicle records. (Dkt. 53 at 26–28.) But the EGA neither authorizes dismissal of this case nor limits the United States' ability to bring suit. It is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107-347, § 208(b)(l)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The SVRL would be kept on a system for which a PIA has been done. Only when a new system is established—not when each new data request is made—is a PIA required.[7] Moreover, the DPPA explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(l), disclosure is allowed "for use by any

---

[6] Thus, the Intervenors' discussion of *Lynd* to argue that Title III does not permit a demand for private information is inapposite. (Dkt. 62 at 27; Dkt. 63 at 24.) *Lynd* was merely reaffirming that Section 301 only covered records and papers that the election officer comes into possession of *in the course of his official duties*. *Lynd*, 306 F.2d at 231. Indeed, Voter Registration Forms, which "comes into [the] possession" of Secretary Hobbs even under CC-WCAEF Intervenors' reading, includes some of the same information that they argue is foreclosed by state law. If state law prevents the disclosure of Washington's SVRL, it would also prevent the disclosure of completed Voter Registration Forms in the possession of Secretary Hobbs.

[7] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited May 11, 2026).

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

government agency . . . in carrying out its functions," including law enforcement or other regulatory enforcement purposes. The DPPA's prohibition is clearly not implicated in the present case.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. There is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. The Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use. The Complaint, incorporating the demand, is in full compliance. At most, these federal statutes only affect the disclosure of an SVRL *by* the federal government, not disclosure of an SVRL *to* the Attorney General. *Cf. H. Kessler & Co. v. E.E.O.C.*, 472 F.2d 1147, 1150–51 (5th Cir. 1973) (interpreting language similar to Section 304). Federal privacy laws do not prohibit the Attorney General from inspecting, reproducing, or copying Washington's SVRL.

**B. Any state law raised by movants that prevents the disclosure of Washington's SVRL is preempted.**

The CC-WCAEF Intervenors argue that Washington law prevents Secretary Hobbs from furnishing Washington's SVRL to the federal government. (Dkt. 62 at 26–27 (citing Wash. Rev. Code § 29A.08.72(3)(A), .710).) This argument inverts the constitutional scheme under the Elections Clause.

The United States Constitution vests the states with primary responsibility for the conduct of elections. At the same time, it expressly authorizes Congress to regulate federal elections where appropriate. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

31

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision . . . . Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 832–33 (1995)). Therefore, any state election regulation that conflict with the ones made by Congress "ceases to be operative." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 384 (1880)).

Congress enacted broad provisions recognizing both state conduct and federal oversight in the CRA, HAVA, and the NVRA. State election officials like Secretary Hobbs are given the primary responsibility for administering elections. HAVA requires states to implement a computerized SVRL and meet "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and that provides "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

The CRA imposes a "sweeping" obligation on Secretary Hobbs to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226; 52 U.S.C. § 20701. Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20507(a)(4), 20507(b), 20510(a). This approach recognizes state officials as responsible for conducting elections, and federal officials as responsible for election oversight. Moreover, the data the United States requests under the CRA is the same that twenty-five states—including Washington—routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list maintenance requirements.[8]

Prioritizing Washington's privacy laws over the Attorney General's Title III authority would subordinate the congressional assignment of federal oversight. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter in Washington, that requires their driver's license number, last four digits of the social security number, or other HAVA identifying number. *See* 52 U.S.C. § 21083 (a)(5)(D). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, or registrants who are otherwise no longer eligible to vote in federal elections.[9]

This was the same argument pursued by states during the passage of Title III. As Congress debated requiring election officers to preserve registration records, states opposing Title III enacted

---

[8] *See* ERIC, Who We Are, *available at* https://ericstates.org/who-we-are/ (last visited June 2, 2026).

[9] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including . . . (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters . . . .").

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

33

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

laws that permitted registrars to destroy those records after 30 days. *See, e.g., United States v. Cartwright*, 230 F. Supp. 873, 875 n.2 (M.D. Ala. 1964). Federal courts did not accept this evasion back in the 1960s, and this Court should not accept a similar federalism argument here.

\* \* \*

Nothing is more fundamental to our system of government than the fairness and reliability of our elections. Consistent with the principles of federalism, the Constitution gives primary authority over the conduct of federal elections to the states. However, the Framers also recognized the danger of giving states unlimited authority in this important area, and so they gave Congress power to "make or alter" regulations governing such elections. U.S. Const. art. I, § 4, cl. 1. History has shown though that states have sometimes abused the authority they have over federal elections. As a matter of federalism then federal oversight is essential to ensure the integrity of those elections, as well as to the faith of American citizens in the outcome of those elections.

To that end, Congress enacted Title III, giving the Attorney General an investigative tool to obtain election records. Its invocation by the Attorney General, although powerful, does not result in an adjudication of any kind and does not settle or change any legal rights. And although this broad grant of investigative power arose against race-based civil rights abuses of the 1960s, Title III reaches beyond those original abuses.

Of course, the Department now has enforcement authority over many election laws, not just the 1957 Act, but unlike other titles of the CRA, Title III is not limited by its text to cases involving racial discrimination. Furthermore, regardless of which federal election law the Department might be enforcing, the problem recognized by President Eisenhower remains: without access to state and local election records, including records created by election officials, enforcement

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

is hampered, "minimiz[ing] the effectiveness" of the federal laws. Special Message to the Congress on Civil Rights, Dwight D. Eisenhower, *Pub. Papers of the Presidents* 166 (Feb. 5, 1959). It follows, then, that as Congress enacted new federal election laws and expanded the Attorney General's enforcement authority to cover those new laws, it also intended Title III to apply, giving the Attorney General access to the election records that were necessary to verify compliance with the new laws. This intention has long been recognized, without controversy.

The risk of voting-related civil rights abuses like those of the 1960s is still with us, and the Attorney General must have the investigative power to prevent such abuses. Moreover, new voting-related civil rights abuses have led to new federal election laws, and the Attorney General must likewise have the investigative power to prevent these new abuses. Whether the offender is a local election jurisdiction that unlawfully excludes the registrations of black citizens or a state that unlawfully includes the registrations of noncitizens, the votes of citizens are debased, and Title III exists to give the Attorney General the practical ability to identify such abuses and put an end to them. History has shown that the integrity of federal elections cannot be left exclusively to the states. The federal government has an appropriate oversight role, through the uniform enforcement of minimum standards and through Title III, so that the outcome of every federal election—whoever the winner or the loser might be—is one we can trust.

**CONCLUSION**

For the foregoing reasons, the United States respectfully submits that the Motions to Dismiss be denied (Dkt. Nos. 53, 62–63), and that the United States' Motion to Compel (Dkt. No. 29) be granted.

UNITED STATES' CONSOLIDATED RESPONSE TO MOTIONS TO DISMISS AND RESPONSES AND OPPOSITIONS TO THE UNITED STATES' MOTION TO COMPEL [Case No. 3:25-cv-0678-KKE]

35

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767

DATED: June 8, 2026

KRISTIN B. JOHNSON
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Email: kristin.b.johnson@usdoj.gov
Phone: (206) 553-7970
Fax: (206) 553-4073

*Local Attorney for the United States*

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

*/s/ John R. Casali*
JOHN R. CASALI
RAYMOND YANG
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, 8th Floor
Washington, D.C. 20002
Email: john.casali@usdoj.gov
Phone: (202) 316-8087

*Attorneys for the United States*

I certify that this memorandum contains 11,751 words, in compliance with the Court's order (Dkt. No. 45).

UNITED STATES' CONSOLIDATED
RESPONSE TO MOTIONS TO
DISMISS AND RESPONSES AND
OPPOSITIONS TO THE UNITED
STATES' MOTION TO COMPEL
[Case No. 3:25-cv-0678-KKE]

36

**U.S. Department of Justice**
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 307-2767