Honorable Kimberly K. Evanson

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

STEVE HOBBS, in his official capacity as
Secretary of State for the State of Washington,

               Defendant.

No. 3:25-cv-06078-KKE

**BRIEF OF AMICI CURIAE FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE**

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 2
No. 3:25-cv-06078-KKE

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## I.  INTEREST OF *AMICI*[1]

*Amici curiae*, listed in Appendix A, are former attorneys who worked on voting enforcement in the Civil Rights Division (CRT) of the U.S. Department of Justice (DOJ).  Many *amici* made, reviewed, and approved information requests under Title III of the Civil Rights Act of 1960 (CRA), or litigated under the CRA, the National Voter Registration Act (NVRA), and the Help America Vote Act (HAVA) on behalf of the United States.  *Amici* file this brief to explain that, although DOJ retains significant authority to investigate potential federal election-law violations, DOJ's request to Washington for its full unredacted voter file is inconsistent with prior practice and cannot be justified by the authority it invokes.

## II.  SUMMARY OF ARGUMENT

Title III of the 1960 CRA is a vital tool that helps the Attorney General make "preliminary investigations of registration practices," determine whether to file voting lawsuits, and obtain evidence for those suits.  *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962).  Though "[w]ide scope must be accorded the Attorney General in the facilities for adequate investigation," *id.* at 228, that scope is not unlimited.  Title III requires DOJ to provide "a statement of the basis and the purpose" for its information requests.  52 U.S.C. § 20703.  Here, DOJ has overstepped its bounds by requesting "all fields" of the registration list for every Washington voter—including partial Social Security Numbers (SSNs) and driver's license numbers—without a sufficient basis and in furtherance of an improper purpose.  DOJ has not provided any basis for thinking Washington might be violating federal statutes, much less a basis that would justify requesting all Washington voters' sensitive personal data.  And while

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel has made any monetary contributions intended to fund its preparation or submission.

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 3
No. 3:25-cv-06078-KKE

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

DOJ has provided a purpose for its requests—enforcing federal list-maintenance requirements—that purpose appears to be a stalking horse for its true purpose: to enable the federal government to conduct its own list maintenance to discover whether noncitizens are registered to vote. That purpose cannot justify the requests for sensitive data here. Federal law places *States* in charge of developing and maintaining voter registration lists. DOJ's sweeping request, made without adequate investigative rationale, is a radical departure from the sorts of targeted, justified Title III requests that *amici* and others at DOJ have previously made.

### III.  ARGUMENT

### A.    The 1960 CRA Does Not Justify DOJ's Requests In This Case

Title III of the 1960 CRA gave election officials a new duty to "preserve," and granted DOJ a new power to "demand," certain election-related documents—but subject to important guardrails. 52 U.S.C. §§ 20701, 20703. The government must have, and provide its targets with, both the "purpose" for conducting its inquiry and the "basis" for thinking there may be a legal violation to which the requested records would be relevant. 52 U.S.C. § 20703. DOJ has failed to meet that basic standard here: it (1) fails to provide a "basis" for suspecting that Washington is not fulfilling its NVRA and HAVA obligations, and (2) appears to be obscuring its request's true "purpose." When DOJ has used the 1960 CRA, it has rarely sought a State's entire voter database, and it certainly has not done so to enable a fishing expedition.

### 1.    DOJ's Justification For Seeking Full Voter Files From Washington Is Inadequate Under the CRA

DOJ may use the 1960 CRA to seek some information that need not be disclosed under other statutes, like the NVRA. But Title III's statutory framework restricts DOJ's ability to obtain and disseminate this material. Any demand for records under the statute "shall contain a statement of *the basis and the purpose* therefor." 52 U.S.C. § 20703 (emphasis added). As

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 4
No. 3:25-cv-06078-KKE

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

with any statute, the Court must "avoid a reading which renders some words altogether redundant." *Gonzalez v. Herrera*, 151 F.4th 1076, 1085 (9th Cir. 2025).  The statute's use of the word "and" to connect "the basis" with "the purpose" indicates that the United States must show "not just one or the other, but both."  *Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 990 (9th Cir. 2020).

Thus, the purpose and the basis must be read as independent requirements.  The *purpose* of a records request is the rationale for the investigation—*e.g.*, determining whether a State is complying with the NVRA, HAVA, or the Voting Rights Act (VRA).  The *basis* is the statement of the evidence suggesting a potential violation for which the government needs the records to further its investigation.  Combined, the statutory requirements make explicit what is implicitly true for many other coercive, investigative information requests: the agency seeking information must have both a legitimate *purpose* within its enforcement ambit for pursuing an investigation and a sufficient *basis* for suspecting a potential violation to which the records would be relevant.  *See United States v. Powell*, 379 U.S. 48, 58 (1964) (noting administrative summons must have proper purpose "reflecting on the good faith of the particular investigation"); *E.E.O.C. v. Fed. Exp. Corp.*, 558 F.3d 842, 848 (9th Cir. 2009) (administrative subpoenas must be based in statutory authority and satisfy procedural requirements).

DOJ's investigations in Title III's early years confirm the difference between these two necessary procedural elements, both of which were provided in its requests under Section 20703.  In *Lynd*, for instance, DOJ's purpose in requesting records was "to ascertain whether or not violations of Federal law in regard to registration and voting"—*i.e.*, the Civil Rights Act of 1957—"have occurred."  306 F.2d at 229 n.6.  And the basis for the request was "information in the possession of the Attorney General tending to show that distinctions on the basis of race

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

or color have been made with respect to registration and voting within your jurisdiction." *Id.* DOJ made similar statements of basis and purpose in *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).  DOJ cannot seek Washington's full, unredacted voter file when it has satisfied neither Title III's "basis" nor its "purpose" requirement.

### 2.  DOJ has provided no adequate "basis" for needing records from Washington, as the CRA requires.

DOJ has not provided an adequate basis for the broad requests it made in this case. Although Title III does not impose a high standard for the basis of a records demand, the provision is not so deferential as to enable requests that are "in the nature of a 'fishing expedition.'" *Peters v. United States*, 853 F.2d 692, 700 (9th Cir. 1988).  Rather, the statutory requirement that the Attorney General articulate in writing the "basis" for a Title III demand means that DOJ must know of specific, articulable facts suggesting that a violation of federal law may have occurred.  *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6.

To be sure, early cases—decided in the midst of a concerted effort to frustrate federal investigations of racial discrimination in Jim Crow South voter registration—opined that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' . . . is not open to judicial review or ascertainment." *Id.* at 226.  That assertion in *Lynd* must be considered in the context of what was a particularized investigation into racial discrimination in 1961 Forrest County, Mississippi, and in four rural parishes in northwest Louisiana—not a dragnet of unprecedented national scope.  But even so, the Supreme Court has since held that notice requirements similar to Title III's create judicially reviewable standards.  *See Powell*, 379 U.S. at 53, 58 (holding statute requiring Treasury Secretary to

BRIEF AMICI CURIAE OF FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE – Page 6
No. 3:25-cv-06078-KKE

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

"notif[y] the taxpayer in writing that an additional inspection is necessary" allows courts to "inquire into the underlying reasons for the examination" because "a court may not permit its process to be abused").  The Court also has long applied a strong presumption in favor of judicial review of the government's actions, and the Administrative Procedure Act "itself articulates the default principle that parties in enforcement proceedings can challenge an agency's interpretation of a statute." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 156 (2025).

Here, DOJ has provided no basis at all for demanding sensitive data about every Washington voter, much less a basis indicating that Washington possibly violated federal law. DOJ's letter sought "Washington's statewide voter registration list" containing "*all fields*," and claimed its purpose was "to ascertain Washington's compliance with the list maintenance requirements of the NVRA and HAVA."  Dkt. 30-1, at 1–2.  Yet DOJ never stated any *basis* for needing to request Washington's *entire, unredacted* voter registration list.

Requiring that basis is especially important given the questionable fit between DOJ's demand and its ostensible purpose.  The statutes DOJ invokes only require States to conduct a "general program" of list maintenance that makes a "reasonable effort" to remove deceased or relocated voters from the rolls.  52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(4)(A) (requiring a "system of file maintenance").  "[T]he attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026).  A static snapshot of a State's entire voter file is unlikely to convey whether a State is making that reasonable effort through a continuing program. *See, e.g.*, *id.* at 626 (rejecting identification of "27,000 'potentially deceased' voters on Michigan's registration rolls" as evidence of an NVRA

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 7
No. 3:25-cv-06078-KKE

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

violation).  Indeed, HAVA provides that "[t]he specific choices on the methods of complying with [the list maintenance mandate] shall be left to the discretion of the State."  52 U.S.C. § 21085.  And the potential for government misuse of the information sought—including partial SSNs and driver's license numbers—outweighs any reason yet provided for needing that information to investigate ostensible HAVA or NVRA violations.  DOJ therefore cannot derive from the NVRA's and HAVA's mandates a "basis" for seeking Washington's full voter files. 52 U.S.C. § 20703.

### 3.    DOJ cannot seek voter records for the purposes of conducting its own list maintenance and identifying noncitizens.

DOJ fails Title III's "purpose" requirement because DOJ's true purpose is not articulated in the request for records and would exceed DOJ's enforcement authority.  Although courts are deferential in reviewing an information request's purpose, they are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).  News reports and the Administration's public statements reveal that DOJ's true purpose in seeking these voter files is not what DOJ stated in its information requests—to monitor Washington's compliance with the NVRA and HAVA's list-maintenance requirements.  Rather, that proffered purpose is a pretext for other aims, including sharing all States' voter data with the Department of Homeland Security (DHS) as part of an effort to discover what DOJ thinks are noncitizens unlawfully voting.

DOJ is currently "compiling the largest set of national voter roll data it has ever collected" in an attempt "to prove long-running, unsubstantiated claims that droves of undocumented immigrants have voted illegally."  Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025),

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 8
No. 3:25-cv-06078-KKE

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

https://perma.cc/9PM4-2A6R. As part of that project and objective, DOJ plans to compare States' "voter data to a different database, maintained by" DHS, "to see how many registered voters on the state lists match up with noncitizens listed by immigration agents." *Id.* This database, called SAVE, is notoriously inaccurate. *E.g.*, Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/BB2L-SAG9. An executive order, blocked by a court last fall, required DHS and DOGE to crosscheck DHS's citizenship list with state voter rolls. *See* Exec. Order No. 14,248, § 2(b)(iii), 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025).

To accomplish these goals, DOJ has requested voter-roll data from at least 48 States and so far has sued 30 of them and the District of Columbia. *See Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (last updated May 11, 2026), https://perma.cc/G2PC-PP6V. The Acting Chief of DOJ's Voting Section, Eric Neff, confirmed in a recent court hearing that DOJ has now "enter[ed] a use agreement with" DHS and "intend[s] to" send States' voter lists through DHS's SAVE database. Mar. 26, 2026 Hr'g Tr. 65:6–10, 65:23–24, *United States v. Amore*, No. 25-CV-639 (D.R.I.), Dkt. No. 47. Indeed, DOJ's Office of Legal Counsel (OLC) recently released an opinion that, while purporting to justify CRT's requests, noted that CRT "proposed to share these lists with . . . DHS, which would enable cross-referencing the lists against existing databases in order to identify illegal aliens who are ineligible to vote." *Authority to Obtain and Share Statewide Voter Roll Data*, 50 Op. O.L.C. __, at *5 (May 12, 2026) ("OLC Op."), https://www.justice.gov/olc/media/1440346/dl. OLC claims that CRT "represented to us that it decided to use the voter registration lists to investigate voter fraud, including by illegal aliens, only after issuing the section 303 demands in question." *Id.* at *20. Yet OLC first advised CRT

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 9
No. 3:25-cv-06078-KKE

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

regarding CRT's plans to share data with DHS "[i]n early September 2025," *id.* at *1—and CRT issued its request to Washington *on September 8, 2025*, Dkt. 30-1. So when CRT told Washington its request's purpose was to monitor NVRA compliance, it actually had already decided to use the data for another purpose: to identify immigrant voters for possible voter fraud prosecutions by a different division of DOJ.

There are also indications that federal agencies may use voters' data to engage in broader immigration enforcement. For instance, an attorney in the Housing Section of CRT, who was "detailed to work in the Voting Section enforcing the [NVRA]" and participated in making the requests for States' voter rolls, warned the *New York Times* in November that they "had a concern that the data would be used not for purging voter rolls of people who aren't eligible to vote but for broader immigration enforcement." Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html. And "Homeland Security Investigations, an arm of Immigration and Customs Enforcement [(ICE)], recently issued a two-page memo," citing the blocked March 2025 executive order, "requiring its employees to 'review all open and closed voter fraud cases' involving immigrants who registered to vote, or actually voted, before they became naturalized U.S. citizens." Glenn Thrush et al., *Administration Targets Noncitizen Voting, Despite Finding It Rare*, N.Y. Times (Feb. 18, 2026), https://www.nytimes.com/2026/02/18/us/politics/voting-trump-immigrants-midterms.html.

Over the past two months, the Administration has reiterated several times the connection between voter-roll collection and immigration enforcement. *First*, when asked by a judge whether voter data could be used "for ICE going to people's homes and arresting them," Mr.

Neff responded: "Good question, your Honor, because the Civil Rights Division cannot promise what any other agency will or will not do." Mar. 26, 2026 Hr'g Tr. 66:8–9, 66:12–14, *Amore*, *supra*. *Second*, President Trump issued a new executive order requiring DHS to create federal citizenship lists and threatening loss of federal funds for noncompliance and prosecution of election officials who send ballots to those the federal government deems ineligible. Exec. Order No. 14,399, §§ 2(a)–(b), 5, 91 Fed. Reg. 17125, 17125–27 (Mar. 31, 2026). And *third*, OLC's opinion, while denying DOJ intended to use the voter-roll data itself for immigration enforcement, OLC Op. *6 n.5, admitted that CRT's actions "may have incidental immigration consequences by providing DHS updated information regarding the location of illegal aliens," *id.* at *5.

DOJ's use of the CRA for this purpose—to address the supposed (and long unsubstantiated) "problem" of perceived widespread noncitizen voter fraud by compiling and using its own voter lists as a means of forcing voter-roll purges—is improper twice over.

First, it is not the "purpose" that DOJ set forth in its "statement" to Washington. 52 U.S.C. § 20703. "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). An agency's action thus cannot be sustained when there is "a significant mismatch between the decision [an agency] made and the rationale [it] provided." *Dep't of Com.*, 588 U.S. at 783. This principle is especially important in the context of a proceeding to enforce administrative process, since it would be an abuse of the court's *own* process to invoke it when there are doubts about "the good faith of the particular investigation." *Powell*, 379 U.S. at 58.

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 11
No. 3:25-cv-06078-KKE

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Second, even if DOJ had been transparent about its purpose for seeking voter data, that purpose would have been improper, as the very statutes that DOJ invokes establish that the *States*, not the federal government, are in charge of maintaining voter rolls. *See United States v. Bellows*, 2026 WL 1430481, at *7–8 (D. Me. May 21, 2026). The NVRA provides that "each *State* shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4) (emphasis added). HAVA is likewise clear that *States* are required to define, maintain, and administer voter rolls. For example, HAVA requires "each State" to "implement" a "computerized statewide voter registration list *defined, maintained, and administered at the State level*." 52 U.S.C. § 21083(a)(1)(A) (emphasis added). It is this "list" that serves "as the official voter registration list for the conduct of all elections for Federal office in the State." *Id.* HAVA similarly requires each State to provide for a "[m]inimum standard for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), but leaves the means of implementation to the States, 52 U.S.C. § 21085. While DOJ has authority to enforce these provisions, 52 U.S.C. §§ 20510(a), 21111, it does *not* have authority to conduct list maintenance itself and then force States to remove certain voters from their rolls. Yet that is precisely what a Memorandum of Understanding that DOJ offered to several States proposed to do. *See* Confidential Memorandum of Understanding 5, U.S. Dep't of Just. (Dec. 1, 2025), https://perma.cc/G2PC-PP6V (click hyperlink over phrase "confidential memorandum of understanding" on Brennan Center page); OLC Op. *5.

Nothing in the CRA, the NVRA, or HAVA authorizes CRT to use highly sensitive, personal data in state voter rolls to conduct a nationwide search for individual registrants it suspects may not be eligible to vote.

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 12
No. 3:25-cv-06078-KKE

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**B.    CRT Has Previously Used The Civil Rights Act To Seek Targeted Information Based On Reasonable Law-Enforcement Concerns**

DOJ's demand for Washington's full voter roll is also out of step with the way CRT historically has used Title III's records-inspection authority: as a focused investigative tool tethered to concrete, articulable concerns about unlawful registration or voting laws or practices.

The earliest Title III cases from the 1960s arose against a backdrop of blatant, widely documented racial exclusion from voter registration. *See United States v. Lynd*, 301 F.2d 818, 818–19 (5th Cir. 1962). Those cases underscore that Title III's inspection mechanism is an investigative instrument keyed to identifiable concerns about discriminatory voting practices in discrete locations, not a freestanding entitlement to assemble broad voter data sets in search of a "problem." In *Kennedy v. Bruce*, 298 F.2d 860, 863–64 (5th Cir. 1962), for example, the Fifth Circuit noted that the record reflected extraordinary racial disparities in access to registration in Wilcox County, Alabama, that made an inspection plainly appropriate. And in *Lynd*, the Fifth Circuit emphasized with respect to five southern counties that a Title III application is intended to "enable the Attorney General to determine whether . . . suit[s] . . . should be instituted" and "to enable him to obtain evidence for use in such [suits] if and when filed." 306 F.2d at 228. These requests fulfilled Title III's principal purpose: serving as a "necessary supplement" to, and helping to "implement federal enforcement" of, the 1957 Civil Rights Act's prohibitions against racial discrimination in voting. H.R. Rep. No. 86-956, at 26 (1959). It is unthinkable that DOJ in 1960 could instead have invoked the authority of the new CRA to demand millions of voter registration cards held by the thousands of voter registration authorities across the country.

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 13
No. 3:25-cv-06078-KKE

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Modern practice reinforces the same point. When CRT has invoked Title III more recently, it has typically done so to obtain discrete categories of records narrowly keyed to specific, articulated enforcement concerns. Several examples illustrate how CRT has traditionally wielded its Title III investigative authority:

- When necessary to investigate potential violations of Section 2 of the VRA, the Voting Section has sent Title III requests to jurisdictions under investigation based on definite, articulable discriminatory practices, seeking, *e.g.*, a voter registration list to conduct racial bloc voting analysis of elections held within the jurisdiction. DOJ has not generally needed, and has rarely made, Title III requests for SSNs or driver's license numbers to conduct any such analyses.

- In 2021, DOJ challenged several provisions of Georgia's new omnibus voting law, SB202, as intentionally discriminatory. *See* Compl. ¶ 161, *United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga. June 25, 2021), Dkt. No. 1. Counties with records relevant to the case were not parties to the suit, and the district court stayed discovery while deciding the motions to dismiss. *See* Min. Order of Aug. 6, 2021, *Georgia*, *supra*. DOJ used its authority under Title III to request county records that were relevant to the allegations that DOJ had already made in its lawsuit: (1) the Numbered Lists of Provisional Voters from each polling place in a county—paper lists of provisional voters, with voters' names and their reasons for casting a provisional ballot—which were relevant to DOJ's challenge to SB202's "prohibition on counting most out-of-precinct provisional ballots," Compl. ¶ 161(g); and (2) Drop Box Ballot Transfer Forms—paper records of how many ballots a county picked up from each mail-in ballot drop box on each day—which were relevant to DOJ's challenge to SB202's "cutback

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

in the number of drop boxes permitted" and limitations on their dates and times of use, *see id.* ¶ 161(e). *See, e.g.*, Decl. of Dr. Barry C. Burden, 35, 51, *In re Georgia Senate Bill 202*, No. 1:21-mi-55555 (N.D. Ga. May 30, 2023), Dkt. No. 566-42.

- In 2024, DOJ sued Alabama for systematically removing several thousand people from its active voter rolls within 90 days of a federal election, which would violate the NVRA's Quiet-Period Provision, 52 U.S.C. § 20507(c)(2). *See* Compl. ¶¶ 2–4, *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024), Dkt. No. 1. DOJ sent a letter to state election officials explaining that DOJ had "reviewed reports" (which it cited) suggesting that the State was implementing a "program" to identify and remove registrants identified as noncitizens, in violation of the Quiet-Period Provision. Letter, *Alabama*, *supra*, Dkt. No. 11-7, at 2. DOJ then requested a defined set of materials tailored to that concern, including (1) a list of the voters removed under the State's new processes; (2) a list of any additional voters sent notices of intent to cancel on similar grounds; and (3) a "complete description" of the methodology used, including contacts with or requests to federal agencies. *Id.* at 2–3. The letter did not explicitly invoke Title III. *Id.* But in later conversations, DOJ did "assert[]" that authority, and the State "produced" the requested records "in compliance with Title III." Letter, *Alabama*, *supra*, Dkt. No. 11-9, at 1. The district court granted a preliminary injunction prohibitng the state from continuing the program.

Thus, in the rare instances when DOJ has requested or received sensitive information like SSNs and driver's license numbers, it did so in a targeted way because this information was vital to investigating or proving a potential legal violation in a particular jurisdiction, and there was an articulable reason to believe that a violation might have occurred. DOJ does not

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

usually request such data under Title III. *Cf.* Dkt. 42, at 13 n.5. To the extent DOJ has need of sensitive voter data, it has instead tended to obtain it through traditional civil litigation tools. *See, e.g.*, Fed. R. Civ. P. 34, 45. And it has submitted to strict court supervision and detailed protective orders that prescribe procedures for exchanging, handling, storing, protecting, and deleting this sensitive data. Title III does not offer these kinds of safeguards. *See* 52 U.S.C. § 20704.

Against this backdrop, DOJ's approach in this litigation stands out for both overbreadth and lack of justification.

## IV. CONCLUSION

For the reasons discussed above, the Court should grant Defendants' motions to dismiss.

DATED this 12th day of June, 2026.

LCR 7(b)(5)(B)(vi) Certification: *I certify that this brief contains 4,140 words, in compliance with the Local Civil Rules.*

Respectfully submitted,

*s/ Emily J. Harris*
Emily J. Harris, WSBA No. 35763
Joseph Kingerski, WSBA No. 60101
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
(206) 625-8600 Phone
(206) 625-0900 Fax
eharris@corrcronin.com
jkingerski@corrcronin.com

Noah Bokat-Lindell, *Pro Hac Vice Forthcoming*
O'MELVENY & MYERS LLP
1625 Eye St., N.W.
Washington, DC 20006
(202) 383-5300 Phone

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 16
No. 3:25-cv-06078-KKE

nbokat-lindell@omm.com

*Attorneys for* Amici Curiae *Former Employees of the U.S. Department of Justice*

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 17
No. 3:25-cv-06078-KKE

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**APPENDIX A**

*Alphabetic List of* **Amici Curiae**[2]

**David Becker**
U.S. Department of Justice (1998-2005): *Trial Attorney*, Voting Section (1998–2005)

**Gregory Friel**
U.S. Department of Justice (1989-2022): *Attorney*, Appellate Section (1992–2006); *Special Litigation Counsel*, Appellate Section (2006–2011); *Senior Counsel*, Office of the Assistant Attorney General (2011); *Deputy Assistant Attorney General* (2012–2022)

**Bradley Heard**
U.S. Department of Justice (2010–2022): *Trial Attorney*, Voting Section (2010–2022)

**Brian Heffernan**
U.S. Department of Justice (1978–2011): *Trial Attorney*, Voting Section (2000–2009); *Special Litigation Counsel*, Voting Section (2009–2011)

**Robert Kengle**
U.S. Department of Justice (1984–2005): *Trial Attorney*, Voting Section (1984–1996); *Special Counsel*, Voting Section (1996–1999); *Deputy Chief*, Voting Section (1999–2005)

**Timothy Lambert**
U.S. Department of Justice (2001–2004): *Trial Attorney*, Voting Section (2001–2004)

**Justin Levitt**
U.S. Department of Justice (2015–2017): *Deputy Assistant Attorney General*, Civil Rights Division (2015–2017)

**Steven Mulroy**
U.S. Department of Justice (1991–2000): *Trial Attorney*, Voting Section (1991–1995)

---

[2] *Amici* submit this brief in their personal capacities.  *Amici*'s institutional affiliations are for identification purposes only.

BRIEF AMICI CURIAE OF FORMER EMPLOYEES
OF THE U.S. DEPARTMENT OF JUSTICE – Page 18
No. 3:25-cv-06078-KKE

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**Stephen B. Pershing**
U.S. Department of Justice (1996–2005): *Trial Attorney*, Voting Section (1996–2005)

**John Powers**
U.S. Department of Justice (2007–2015, 2021–2024): *Civil Rights Analyst & Senior Civil Rights Analyst*, Voting Section (2007–2015); *Counsel*, Office of the Assistant Attorney General (2021–2024)

**Joseph Rich**
U.S. Department of Justice (1968–2005): *Trial Attorney*, Southern Section (1968); *Chief*, Voting Section (1999–2005)

**Bob Rush**
U.S. Department of Justice (1970–1973): *Trial Attorney*, Voting Section (1970–1973)

**Elizabeth Ryan**
U.S. Department of Justice (2012–2025): *Trial Attorney*, Voting Section (2012–2025)

**Bryan Sells**
U.S. Department of Justice (2010–2015): *Special Litigation Counsel*, Voting Section (2010–2015)

**Avner Shapiro**
U.S. Department of Justice (2000–2007, 2013–2016): *Trial Attorney*, Voting Section (2000–2007, 2013–2016)

**Thomas Sheran**
U.S. Department of Justice (1971–1977): *Trial Attorney*, Voting & Public Accommodations Section (1971–1977)

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900